UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DIANA COATES, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 3-10-71 |
| | § | |
| BRAZORIA COUNTY TEXAS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM AND ORDER**

This case arises out of allegations that James Blackstock, a former elected court-at-law judge for Brazoria County, sexually harassed and assaulted female county employees while the County acquiesced and ultimately retaliated against certain of those employees for blowing the whistle. Plaintiffs Diana Coates and Margo Green—who formerly worked as the Chief and Assistant Chief, respectively, of the Brazoria County Juvenile Probation Department—filed claims under section 1983 and Title VII against Blackstock, Brazoria County, and the Brazoria County Juvenile Board. This Court dismissed the claims against the Juvenile Board, holding that the Board lacked the capacity to sue or be sued, as it had not been vested with such statutory authority. *Coates v. Brazoria County*, No. G-10-71, 2012 WL 3930314, at *3 (S.D. Tex. Sept. 10, 2012).

Brazoria County now seeks dismissal, or alternatively summary judgment, on Plaintiffs' section 1983 claims.[1]  The motion requires the Court to address a number of intricate areas of section 1983 law, including whether the Juvenile Board or District Attorney exercises final policymaker authority for Brazoria County in the challenged areas and whether a section 1983 claim can be based on failure to prevent a pattern of sexual harassment.  Fifth Circuit section 1983 case law and Texas statutes governing juvenile boards provide the following answers to these questions: Plaintiffs' claims based on allegations about the conduct of the Juvenile Board survive, but those based on allegations that the District Attorney failed to prosecute Blackstock do not.  Accordingly, the County's Motion to Dismiss or, Alternatively, Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

Plaintiffs began working with Blackstock on a regular basis in January 2007 when he became Chairman of the Juvenile Board.  According to Plaintiffs, Coates's relationship with Blackstock started as a friendship, but gradually developed into one filled with crude innuendo and advances, pornographic emails,

---

[1] The County also seeks summary judgment on Plaintiffs' Title VII claims; however, those arguments were already considered by Judge Hoyt and denied in his February 29, 2012 Order. *See* Docket Entry Nos. 73 (County's January 14, 2012 motion for summary judgment on Plaintiffs' Title VII claims); 89 (Order denying summary judgment).  As stated at the August 8, 2012 hearing, this Court's practice is not to reconsider Judge Hoyt's rulings.  Consistent with that practice, the County's motion with respect to the Title VII claims is denied.

intimidation, unwanted physical sexual contact, and retaliation.  Plaintiffs allege that Blackstock subjected Green to similar conduct on several occasions.  Coates, on behalf of herself and Green, reported Blackstock's harassment to County Judge Jerri Mills—a member of the Juvenile Board and one of Plaintiffs' immediate supervisors—in February 2008 after Blackstock instructed them to attend a conference with him in Corpus Christi.  Plaintiffs allege that after the conference, Mills brought Coates to meet with two other members of the Juvenile Board— District Judges W. Edwin Denman and K. Randall Hufstetler—to whom Coates also reported the incidents.  The judges advised Coates to file a grievance with the Texas Commission on Judicial Conduct, however, Coates and Green decided not to pursue a grievance, purportedly out of fear that it would be futile and risk their jobs.

Plaintiffs present evidence that at least seventeen other women were harassed or assaulted over Blackstock's thirty-year legal career.  Many of these women were not county employees and many did not report the alleged harassment when it happened, though testimony demonstrates that members of the Juvenile Board and district attorney's office were aware of Blackstock's history.  For instance:

- Mills testified that she was aware of a sexual harassment suit filed by an Adult Probation Officer against Blackstock in this Court in 1993 when Mills was chairwoman of the Adult Probation Board of Brazoria County.  Docket Entry No. 145-6, Ex. F at 133:18–134:4.  District

Attorney Jeri Yenne handled the matter as an assistant district attorney.  Docket Entry No. 145-2, Ex. A-4 at 127:22–128:15;

- Lenette Terry, a lawyer in Brazoria County, testified that in 1995 or 1996, she was harassed by Blackstock and discussed the incident with Mills and other lawyers who later became assistant district attorneys for Brazoria County.  Docket Entry No. 145-1, Ex. A-3 at 139:2–152:21.  She stated that "very few" Brazoria County lawyers did not know about Blackstock's conduct, *id.* at 139:15–20, or, in other words, that "[e]veryone knew about it," *id.* at 45:1–5;

- Mills testified that she was aware of an incident where Blackstock inappropriately hugged and touched the breast of a Juvenile Probation Department secretary, Christie Strawn, who asked Mills not to report the incident.  Docket Entry No. 145-6, Ex. F at 151:11–153:7, 159:17–160:13;

- Yenne testified that, in 2006, Brazoria County Clerk Joyce Hudman reported an incident of Blackstock's sexual assault to the district attorney's office, but Hudman did not want to pursue charges.  Docket Entry No. 145-8, Ex. I at 34:25–41:7;

- Coates testified that when she met with Mills in February 2008, Mills confided that "she knew about his past history," "she wasn't really surprised [because] there had been allegations before," and "one of the people that came forward got fired."  Docket Entry No. 145-5, Ex. D at 131:20–132:19, 158:21–159:12; and

- Coates testified that during the meeting with Mills, Denman, and Hufstetler, they discussed Blackstock's assault on Strawn, and Coates provided the judges with pornographic emails that Blackstock sent her and other juvenile probation department employees, *id.* at 218:8–220:14; Docket Entry No. 147-3.

In August 2008, juvenile probation officer Mikka Kalina reported to her supervisor that Blackstock had harassed and assaulted her.  After learning of Kalina's situation, Coates and Green went to Judge Hufstetler, who then reported to the district attorney.  The district attorney's office quickly began an

investigation and uncovered numerous other alleged victims of Blackstock's harassment. The district attorney filed criminal charges against Blackstock on August 12, 2008, and he was immediately suspended from the bench. The Equal Employment Opportunity Commission (EEOC) also conducted an investigation, and found that Brazoria County supervisors and judges "shirked their responsibility to prevent and correct sexual harassment by Judge Blackstock in the workplace" and that the judges of the Juvenile Board who knew of the sexual harassment and did nothing should be reported to the state judicial committee. Docket Entry No. 145-9, Exs. M-1, M-2, N.

Plaintiffs allege that after the EEOC issued its determinations, they became the target of County retaliation, which included unprecedented poor performance evaluations, the denial of their requests for supplies at the detention facility, and eventually their terminations.

The County tells a different story. On December 12, 2009, the County received an e-mail from the counsel of Christie Strawn, who decided to pursue claims against Blackstock after Kalina came forward. Among other things, the letter stated:

> I need your immediate help. One of my clients, Christie Strawn, reports to me today that Diana Coats [sic] and Margo Green (both supervisors) have been engaging in what I believe is retaliatory conduct. Each in their own way have discussed the pending case with Ms. Strawn and encouraged her to drop her case. Among other things, they are stating that things may drag on for a long time and

> Ms. Coats [sic] states that she (Ms. Coats) [sic] will be the one hurt if
> the remaining suits do not settle.  Other conversation has been very
> blunt that the suits should be dropped.

Docket Entry No. 132-4, Ex. K; *see also id.*, Ex. L-2.  In response, the County
initiated an investigation and held an emergency meeting of the Juvenile Board on
December 22, 2009 "[t]o assure immediate compliance" with its obligations under
a conciliation agreement that it had entered with the EEOC in November 2009.
*Id.*, Ex. M.   After reviewing the e-mail from Strawn's counsel and speaking
separately with Coates and Green, the Board voted unanimously to terminate
Coates and Green for "lack of confidence."  *Id.*, Ex. N.  Coates and Green later
filed a charge of retaliation with the EEOC, which found that Plaintiffs were
subject to termination "in retaliation for [their] charge filing activity and the
aftermath of ongoing protected activity that followed [their] charge of
discrimination."   Docket Entry No. 145-9, Ex. R-1; *see also id.*, Ex. R-2.

## II.   STANDARD OF REVIEW

The County's motion seeks dismissal under Rule 12(b)(6) or summary
judgment under Rule 56, without further differentiating between the two.  Because
summary judgment encompasses challenges to both the legal and factual
sufficiency of allegations, whereas a Rule 12 motion can only challenge the legal
sufficiency, the Court will review the County's defenses under the summary
judgment standard.

That standard provides that the reviewing court shall grant summary judgment "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment.  *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

### III.   DISCUSSION

Plaintiffs advance two separate claims under section 1983.  First, they claim that the County violated the Fourteenth Amendment's guarantee of equal protection from sexual harassment.  *See Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997) (noting that sexual harassment in public employment violates the Equal Protection Clause and that circuit courts have allowed plaintiffs to assert such claims under both Title VII and section 1983) (citations omitted).  Specifically, they argue that acquiescence by the Juvenile Board and the district attorney to the "clear and persistent pattern of sexual harassment established a custom and practice of Brazoria County to allow sexual harassment of their employees by defendant Blackstock."  Docket Entry No. 129 ¶

118; *see also* Docket Entry No. 143 at 23–28.[2]  Second, Plaintiffs claim that the County retaliated against them for engaging in constitutionally protected free speech.  They allege that their decision to come forward and report Blackstock's harassment and the County's accountability motivated their termination.

### A.  Final Policymaker under Section 1983

Section 1983 provides a cause of action against any "person, who under color of any statute, ordinance, regulation, custom, or usage" violates an individual's constitutional rights.  42 U.S.C. § 1983.  *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), held that a local governmental entity such as a county is a "person" subject to suit in a section 1983 action.

But the Supreme Court's interpretation of section 1983's "under color of law" requirement was not so simple.  *Monell* differentiates various types of claims alleging governmental misconduct.  A local government entity may be sued "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'"  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (quoting *Monell*, 436 U.S. at 690).  A single decision may constitute such an official policy

---

[2] Plaintiffs' latest Complaint also states that the County harassed Plaintiffs "by and through" Blackstock, on the basis that Blackstock was a final policymaker for the County, Docket Entry No. 129 ¶ 116; however, Plaintiffs do not advance this position in response to the County's motion, *see* Docket Entry No. 143 at 23.

of the governmental body "*if* that decision were made by a final policymaker responsible for that activity." *Brown v. Bryan County*, 67 F.3d 1174, 1183 (5th Cir. 1995) (emphasis in original).  "Alternatively, municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval."  *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).  In such an instance, "[a]ctual or constructive knowledge of such custom must be attributable to the governing body . . . or to an official to whom that body has delegated policy-making authority."  *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984).  However, the doctrine of *respondeat superior* does not apply to section 1983 liability; a local government may not be held liable merely for employing a tortfeasor.  *See Zarnow*, 614 F.3d at 167 (citations omitted).  Section 1983 claims thus often require a "determination of whether a municipal official wields final policymaking authority regarding a particular action."  *Brady v. Fort Bend County*, 145 F.3d 691, 698 (5th Cir. 1998) (citing *McMillian v. Monroe County*, 520 U.S. 781 (1997)).

Plaintiffs' claims implicate this "final policymaker" issue.  Their retaliation claim is a "single decision" claim that requires them to prove, among other things, that a final policymaker was responsible for the decision to terminate them.  Their harassment claim alleges an unconstitutional custom and requires them to prove

that a final or official policymaker had actual or constructive knowledge of the practice of allowing Judge Blackstock's sexual harassment.  Plaintiffs contend that the Juvenile Board was the official policymaker responsible for the alleged retaliation, and the Juvenile Board and district attorney were official policymakers who had actual knowledge of Blackstock's widespread harassment and took no action.  The County argues that the only relevant policymaker is the Commissioners Court, because only it has the authority to set County policy with respect to personnel policies dealing with sexual harassment and retaliation. Moreover, it argues that the Juvenile Board is a separate and distinct governmental entity from the County.  For the reasons discussed below, the Court disagrees with the County's premise as it relates to the Juvenile Board because Texas law delegates to the Board final policymaking authority for juvenile probation department personnel policies.  With respect to the district attorney, however, the Court concludes that her exercise of prosecutorial authority cannot give rise to section 1983 liability.[3]

---

[3] The Court need only briefly address the Plaintiffs' weaker arguments that the Commissioners Court acted as a final policymaker in terminating Plaintiffs and ignoring Blackstock's harassment.  The state, not the Commissioners Court, delegated the Juvenile Board with employment decisions over juvenile probation department personnel, and the Juvenile Board acted on its own in terminating Plaintiffs.  *See infra* pp. 14–19.  In any event, Plaintiffs fail to demonstrate that the Commissioners Court had actual or constructive knowledge of Blackstock's pattern of harassment.  They only present evidence attributable to County Judge Joe King, *see* Docket Entry No. 145-10, Ex. V at 131:22–132:14, but that evidence does not show he had knowledge of a pattern of harassment sufficient to raise a fact issue that the Commissioners Court had a custom of allowing harassment.

### i.   The Juvenile Board

#### a.  County or State Entity

The Juvenile Board can only be a relevant final policymaker for Brazoria County if it is a county agency rather than a state agency with a separate and independent existence.  While not the thrust of its argument, the County cites a recent Texas Court of Appeals decision, which held that El Paso County was not a proper party to a section 1983 claim aimed at the conduct of an El Paso Juvenile Probation Department employee because the Juvenile Probation Department is a separate governmental entity apart from the county.  *See El Paso County v. Solorzano*, 351 S.W.3d 577, 584 (Tex. App.—El Paso 2011, no pet.).

For the same reasons provided in this Court's September 10, 2012 ruling, *see Coates*, 2012 WL 3930314, at *4, and the Fifth Circuit's opinion in *Flores v. Cameron County*, 92 F.3d 258, 264–69 (5th Cir. 1996),[4] the Court rejects *Solorzano* and concludes that the Juvenile Board is a county agency rather than an arm of the state.  Texas law defines a juvenile board as "a body established by law to provide juvenile probation services *to a county*."  Tex. Hum. Res. Code Ann. § 201.001(a)(6) (emphasis added); *see also Flores*, 92 F.3d at 267 (finding that the

---

[4] The Fifth Circuit considered the following six factors in reaching its conclusion: "(1) whether state law views the entity as an arm of the state; (2) the source of the entity's funding; (3) the degree of local autonomy retained; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether the entity retains the right to hold and use property."  *Flores*, 92 F.3d at 265 (quoting *Stem v. Ahearn*, 908 F.2d 1, 4 (5th Cir. 1990)).

Cameron County Juvenile Board "is concerned primarily with local problems, namely, the provision of juvenile probation services to the inhabitants of Cameron County"). The provisions regarding juvenile boards are located in Chapter 152 of the Texas Human Resource Code, separate from the provisions regarding the state-run Texas Juvenile Justice Board, which formerly operated as the Texas Juvenile Probation Commission. *See Flores*, 92 F.3d at 265 ("[J]uxtaposing the Commission with county juvenile boards . . . suggests that juvenile boards are county agencies created as a means by which counties can provide juvenile probation services to their populations.").

Additionally, the Brazoria County Juvenile Board is comprised solely of county officials, which include the county district judges, the county court-at-law judges, and the county judge, who is also the "presiding officer" of the Brazoria County Commissioners Court. *See* Tex. Const. art. V § 18(b); Tex. Hum. Res. Code Ann. § 152.0261(a); *see also Commissioners' Court*, State of Texas, County of Brazoria, http://www.brazoria-county.com/comcourt/ComCourtMemberInfo.asp (last visited Dec. 4, 2012). The Board's funding structure also depicts the Board as a dependent county entity. The Commissioners Court pays the Board members compensation at an amount set by that court. Tex. Hum. Res. Code Ann. § 152.0261(b). And, according to representations by counsel at the August 8, 2012 hearing before this Court, the County provides 75% of the Juvenile Board's overall

funding. Moreover, Texas law does not grant juvenile boards the power to sue or be sued, a power typical of independent state agencies. *See Coates,* 2012 WL 3930314, at *3 (discussing this lack of statutory authority); *Flores*, 92 F.3d at 265 (citing an entity's authority to sue and be sued as a factor in assessing whether it is a local or state entity, but not concluding whether the Cameron County board had such authority).

Chapter 142 of the Texas Human Resources Code further suggests that juvenile boards are county entities. *See Flores*, 92 F.3d at 265. For instance, section 142.002(b) establishes that juvenile boards may appoint and set salaries of juvenile probation officers with the approval of the commissioners court. Finally, as detailed in *Flores*, "the opinions of the Texas Attorney General and other Texas statutes referencing county juvenile boards suggest that they are local rather than state entities." *Id.* The Texas Attorney General has determined that juvenile probation personnel are county employees for purposes of federal wage and hour requirements, Tex. Att'y Gen. Op. No. JM-410 (1985), and that the county attorney has a duty to represent and provide legal advice to the county juvenile board, Tex. Att'y Gen. Op. No. H-1133 (1978). And the Texas Local Government Code identifies a county juvenile board as a "specialized local entity." Tex. Local Gov't Code Ann. § 140.003(a). In sum, the Juvenile Board acts as a county agency and not an arm of the state.

### b. Official Policymaking Capacity

Having concluded that the Juvenile Board is, in fact, part of the County, the Court must determine whether the Juvenile Board acted as a final or official policymaker for the County with respect to Plaintiffs' claims. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("[T]he trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue."). As the County correctly points out, the Court's inquiry is guided by two questions: (1) what is the particular government function at issue; and (2) does state law confer final policymaking authority to the official or entity for that particular function? *See McMillian v. Monroe County*, 520 U.S. 781, 785–86 (1997). "State law determines whether a particular individual is a county or municipality final decision maker with respect to a certain sphere of activity." *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) (citations omitted)).

With respect to the first question, the Court finds that the particular government functions at issue are personnel policies and decisions—including those involving terminations, retaliation, and sexual harassment—related to the juvenile probation department. As noted by the County, the functions are "framed by Plaintiffs' Complaint," which focuses on such personnel policies and

decisions—namely, the Juvenile Board's termination of two juvenile probation employees allegedly in retaliation for their exercise of constitutionally protected speech and the Juvenile Board's failure to terminate or take action against a judge who it allegedly knew preyed on women, including juvenile probation employees. Docket Entry No. 133 at 13.   The County's interpretation of the relevant government function as "personnel policies covering all County employees" is too broad; the only personnel policies at issue are those relating to juvenile probation employees.   *Id.* at 5; *see McMillian*, 520 U.S. at 785 ("[T]he question is not whether [the alleged policymaker] acts for [the County] in some categorical, 'all or nothing' manner.").[5]

With respect to the second question, the County argues that state law only confers relevant policymaking authority to the Commissioners Court.  It cites to: (1) the Texas constitution, which states that the Commissioners Court "shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the State, or as may be hereafter prescribed," Tex. Const. art. V, § 18(b); and (2) the Brazoria County Personnel Policy Manual,

---

[5] The Fifth Circuit rejected an interpretation of final policymaking authority analogous to the County's in *Brady*, 145 F.3d at 699.  There, the county defendant argued that the commissioners court, rather than the county sheriff, was the final policymaker regarding county employment policy.  *Id.*  The Court responded: "[T]he County's argument goes astray because it then urges us to paint with too broad a brush and hold that [the sheriff] did not act as the County's final policymaker when he declined to rehire the Plaintiffs because [the sheriff] did not establish the County's employment policy *generally*.  Rather, the appropriate inquiry is whether the sheriff is the County's final policymaker with respect to the specific action at issue here—*filling available employment positions in the sheriff's department*."  *Id.* (emphasis in original).

which is marked as being adopted by the Commissioners Court and includes specific provisions regarding sexual harassment and retaliation, Docket Entry No. 132-1, Ex. A.

Texas law says otherwise.  Though the Commissioners Court establishes personnel policy for the County in general, the legislature explicitly vested the Juvenile Board with authority over personnel policies and decisions for juvenile probation officers.  *See* 37 Tex. Admin. Code § 341.3(a) ("The juvenile board shall adopt written personnel policies."); *see also id.* § 341.2(a)(2) ("The juvenile board shall specify the responsibilities and functions of the juvenile probation department as well as the authority, responsibility, and function of the position of the chief administrative officer."); Tex. Hum. Res. Code Ann. § 142.002(a) ("A juvenile board may, with the advice and consent of the commissioners court, employ probation officers and administrative, supervisory, stenographic, and other clerical personnel necessary to provide juvenile probation services according to the standards established by the Texas Juvenile Probation Commission and the local need as determined by the juvenile board.").[6]  Indeed, the juvenile probation department has its own manual of policies and procedures, which the County states is established by the Juvenile Board.  *See* Docket Entry Nos. 132-3, Ex. I; 133 at 5.

---

[6] *Cf. Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984) ("The relinquishment of policymaking and supervision by the governing body is much more likely to exist, and be necessary, as the size and complexity of the government increases.").

The fact that the juvenile probation department's manual follows the Brazoria County Personnel Policy Manual and instructs that "county policies shall prevail in discrepancies between the Department and county personnel policies" does not alter the final policymaker determination. *See* Docket Entry No. 132-3, Ex. I. The Juvenile Board still sets the official policy for the juvenile probation department, whether it chooses to follow the Commissioners Court guidelines, those of another governmental entity or even a private employer, or create its own. *Cf. Bennett*, 728 F.2d at 769 ("[Policymakers] decide the goals . . . and devise the means of achieving those goals."). Likewise, the fact that the Juvenile Board may only employ personnel with the consent of the Commissioners Court, *see* Tex. Hum. Res. Code Ann. § 142.002, does not deprive the Board of policymaking authority. "An official may be a policymaker even if a separate governing body retains some powers." *Zarnow*, 614 F.3d at 168.[7]

The Juvenile Board's handling of Plaintiffs' termination further illustrates its role as a final policymaker. The evidence shows that the Board acted with total discretion and autonomy when it called an emergency meeting regarding Plaintiffs and decided to terminate them. *See* Docket Entry No. 132-4, Exs. M, N. The County admits that "[t]he Juvenile Board, not the County Commissioners Court,

---

[7] The County supports its argument by citing to *Turay v. Harris County*, No. H-09-0913, 2011 WL 841510, at *9 (S.D. Tex. Feb. 17, 2011), which held that the Harris County Juvenile Probation Department was not acting as a final policymaker of Harris County when it allegedly underpaid African American nurses. However, that case did not acknowledge the Texas statutes cited above, which delegate authority to juvenile boards and are dispositive in this case. *See id.*

terminated Plaintiffs' employment."  Docket Entry No. 133 at 14.  This has been the County's position since its initial pleading in this case.  *See* Docket Entry No. 8 at 3 n.5 ("Plaintiffs were both employed by and served at the pleasure of the Juvenile Board.").

The County argues that the Juvenile Board was a mere "decisionmaker" that had discretion to fire Plaintiffs, as opposed to a final policymaker with authority to set official County personnel policy.  In support, it references *Pembaur v. City of Cincinnati*, in which the Supreme Court explained the distinction by discussing a hypothetical county sheriff:

> [I]f county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability.  This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner . . . .

475 U.S. 469, 483 n.12 (1986).  But the proper analogy to juvenile boards under Texas law is not the hypothetical sheriff discussed in *Pembaur* but an actual Texas sheriff, whom the Fith Circuit has held possesses final policymaking authority over hiring decisions under Texas law.  *See Brady*, 145 F.3d at 699–700.  As is true for Texas sheriffs, a Texas juvenile board is not merely granted "discretion to hire and fire employees" by the commissioners court; rather, the Texas legislature has vested juvenile boards with such discretion, and the boards' exercise of that discretion is unreviewable by any other official or governmental body in the

county.  *See Brady*, 145 F.3d at 700 (citing *Pembaur*, 475 U.S. at 484 n.12).  Such

complete discretion and autonomy, coupled with the statutory authority discussed

above, establishes that the Juvenile Board acts as a final policymaker for the

County in handling personnel decisions for juvenile probation employees.[8]  *See id.*;

*Zarnow*, 614 F.3d at 168.

### ii.  The District Attorney

Plaintiffs also argue that the Brazoria County District Attorney, Jeri Yenne,

acted as a final policymaker for the County when she declined to prosecute

Blackstock, despite allegedly knowing of his widespread sexual harassment.  As it

did for the Juvenile Board, the Court must first determine whether the district

attorney was acting as a county official or an arm of the state.  *See Brown v.*

*Lyford*, 243 F.3d 185, 192 (5th Cir. 2001) ("[A] county may only be held liable for

acts of a district attorney when he 'functions as a final policymaker for the

county.'" (quoting *Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir. 1997)).

---

[8] Although Texas law states that juvenile boards may employ personnel "with the advice and consent of the commissioners court," Tex. Hum. Res. Code Ann. § 142.002, no law requires the consent of the Commissioners Court to terminate employees.  In any event, any "indirect constraint" the Commissioners Court may have over the Juvenile Board's personnel decisions is not enough to divest the Board of final policymaking authority.  *See Brady*, 145 F.3d at 699–701 (finding sheriff's discretion to be unreviewable even though Texas law required commissioners court authorization to appoint employees and the commissioners court determined number of deputy positions available).  "That the municipal official need only exercise final policymaking authority with respect to the *specific* action allegedly constituting a constitutional tort thus indicates that the sort of indirect constraint" that could be inferred from section 142.002 "does not indicate a  lack of final policymaking authority . . . ."  *Id.* at 701 (emphasis in original).

"Texas law makes clear . . . that when acting in the prosecutorial capacity to enforce state penal law, a district attorney is an agent of the state, not of the county in which the criminal case happens to be prosecuted." *Esteves*, 106 F.3d at 678; *see also* Tex. Code Crim. Proc. Ann. art 2.01 ("Each district attorney shall represent the State in all criminal cases in the district courts of his district and in appeals therefrom . . . ."). Fifth Circuit precedent clearly distinguishes a district attorney's "prosecutorial" duties—which are conducted on behalf of the state—from those duties that are "administrative or managerial in nature"—which are conducted on behalf of the county. *See Esteves*, 106 F.3d at 678; *see also Brown*, 243 F.3d at 192 ("[A] district attorney with the final word on hiring or firing within the district attorney's office sets county policy regarding those decisions."). Thus, Plaintiffs' citation to *Davis v. Ector County*, 40 F.3d 777, 784 (5th Cir. 1994)—a case in which a district attorney who fired one of his employees was considered to be a county policymaker—is inapposite.

Because Plaintiffs' claims regarding District Attorney Yenne pertain to her prosecutorial rather than administrative duties, the Court concludes that she was not acting as a final policymaker for the County under section 1983 law. The claims against the County based on a failure to prosecute Blackstock earlier are therefore dismissed.

## B.  Causation under Section 1983

The Court next addresses the County's argument that, as a general legal matter, it cannot be held liable under section 1983 for failing to prevent illegal employment practices.  The basis for this argument is that an entity may be held liable only if the entity itself causes the constitutional violation at issue, and Blackstock, not the County, sexually harassed Plaintiffs.

As an initial matter, the Court notes that this argument does not apply to Plaintiffs' retaliation claim.  Plaintiffs do not allege that the Juvenile Board failed to prevent retaliation against them; rather, they allege that the Juvenile Board directly retaliated against Plaintiffs by choosing to terminate them.

But the argument fails even against Plaintiffs' claim that the County knew or should have known of Blackstock's sexual harassment and failed to act.  As discussed above, liability attaches when an official policymaker has actual or constructive knowledge of "[a] persistent, widespread practice of [government] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom." *Webster*, 735 F.2d at 841; *see also Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).  A plaintiff in a section 1983 case must establish both a defendant's requisite degree of culpability—*i.e.*, deliberate indifference to federally protected rights—and the existence of "a direct causal link between the

municipal policy and the constitutional deprivation," *i.e.*, that the policy was a "moving force" behind the violation. *Piotrowski*, 237 F.3d at 580 (citing *Monell*, 436 U.S. at 694).

Here, Plaintiffs allege that the Juvenile Board was deliberately indifferent to, and allowed to continue, the persistent widespread sexual harassment by Blackstock who, although not an official policymaker of the County, was nevertheless a county official. Thus, the "state created danger theory," to which the County tries to pin to Plaintiffs' claims, does not apply. That theory, which the Supreme Court has rejected, involves a governmental defendant placing a plaintiff in the sphere of danger of a third-party, not one of its own officials.[9] *See, e.g.*, *DeShaney v. Winnebago Cnty. Dep't of Soc, Servs.*, 489 U.S. 189, 197 (1989) (holding that social services department is not liable for failing to protect child from abusive parent); *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 866 (5th Cir. 2012) (en banc) (holding that county school district is not liable for allowing student to be picked up from school and raped by unauthorized individual). The Juvenile Board did not fail to protect Plaintiffs from a random, non-county actor; it failed to protect them from a county court-at-law judge with whom they were required to work.

---

[9] There are, however, instances where a plaintiff may have a "special relationship" with a government entity, such that the entity has a constitutional duty to protect the plaintiff from non-state actors. *See Doe*, 675 F.3d at 855. Examples of a special relationship are rare and include incarceration, involuntary institutionalization, and foster care. *See id.* at 855–56.

The Fifth Circuit's *Piotrowski* opinion, which both parties cite, illustrates that Plaintiff's causation theory is viable. In that case, the plaintiff sued the City of Houston for constitutional violations arising from its failure to prevent the plaintiff's wealthy former boyfriend from attempting to kill her. *Piotrowski*, 237 F.3d at 572. The plaintiff alleged that numerous Houston police officers had been bribed by and hired off-duty to work for the boyfriend and his "unsavory" private investigator. *Id.* While the plaintiff alleged four unconstitutional customary policies, including one based on a state created danger, one alleged policy is particularly germane to our case: Houston's failure to investigate properly or discipline two officers after the plaintiff complained of various improper acts. *Id.* at 580. The Court of Appeals determined that, on the facts of the case, no unconstitutional municipal custom or policy was proven because (1) the investigation file was thorough and showed no systematic inattention to the complaints; and (2) there was no pattern of complaints by other citizens. *Id.* at 581–82. Nonetheless, the Court remarked that "a City policy of inadequate officer discipline *could be* unconstitutional if it was pursued with deliberate indifference toward the constitutional rights of citizens." *Id.* at 581 (emphasis added). The Court concluded that, although "it is nearly impossible to impute lax disciplinary policy to the City without showing a pattern of abuses," a pattern could have shown the existence of a policy and official deliberate indifference. *Id.* at 582. In

addition to *Piotrowski*'s general discussion of section 1983 liability, numerous courts have recognized that a local government's failure to prevent a known practice of recurring sexual harassment gives rise to a section 1983 claim.  *See, e.g.*, *Bohen v. City of East Chicago*, 799 F.2d 1180, 1189 (7th Cir. 1986); *Sharp v. City of Houston*, 960 F. Supp. 1164, 1177 (S.D. Tex. 1997); *Wise v. New York City Police Dep't*, 928 F. Supp. 355, 365 (S.D.N.Y. 1996); *Congleton v. Gadsden County*, No. 4:11-CV-00097-SPM-WCS, 2011 WL 2174350, at *2 (N.D. Fla. June 1, 2011).

### C.  The Juvenile Board's Knowledge of a Pattern of Harassment

The final question is whether Plaintiffs have presented sufficient evidence from which a jury could determine that such a pattern existed in this case.  The Court finds that, unlike *Piotrowski* in which there was no pattern of complaints by citizens other than the plaintiff, *id.* at 582, Plaintiffs present evidence that the Juvenile Board was aware of complaints from numerous women demonstrating a pattern of harassment by Blackstock.  When viewed in a light most favorable to Plaintiffs, the evidence shows that, prior to August 2008 when Kalina reported her abuse and the County decided to act: (1) Board member Mills was aware of a sexual harassment suit filed against Blackstock by an adult probation employee; (2) Mills was aware of an incident in which Blackstock sexually harassed a Brazoria County lawyer; (3) multiple members of the Board were aware of

allegations of harassment and assault by a juvenile probation secretary; (4) multiple Board members were aware of Plaintiffs' complaints, including that Blackstock had sent pornographic e-mails to county employees; (5) Blackstock's inappropriate behavior was common knowledge among Brazoria County lawyers; (6) Board member King had received inappropriate e-mails from Blackstock that were sent to other county employees; and (7) Mills admitted to awareness of Blackstock's past history. *See supra* pp. 3–4. This evidence, when taken as a whole, is enough to create a fact issue concerning whether the Juvenile Board had actual knowledge of a persistent, widespread unconstitutional custom or practice.

## IV. CONCLUSION

In sum, the Court finds that the Juvenile Board acted as a final policymaker for the County when it terminated Plaintiffs and allegedly acquiesced in Blackstock's harassment of County employees. But the Court finds that the district attorney acted on behalf of the state of Texas, and not the County, in failing to take action against Blackstock. The Court further finds that sufficient evidence exists to create a fact issue concerning whether the Juvenile Board had the knowledge required to prove that it was deliberately indifferent with respect to Blackstock's conduct. Therefore, the County's Motion to Dismiss or, Alternatively, Motion for Summary Judgment (Docket Entry No. 132) is **GRANTED IN PART** and

**DENIED IN PART**.[10]  Plaintiffs' section 1983 claims against the County alleging unconstitutional conduct on the part of the Juvenile Board will proceed to trial; those alleging unconstitutional conduct on the part of the district attorney are dismissed.

SIGNED this 11th day of December, 2012.

_____
Gregg Costa
United States District Judge

---

[10] The Court also **DENIES** Plaintiffs' motion to strike (Docket Entry No. 144).  The motion is moot given the Court's holding and, in any event, the Court did not rely on any of the objected paragraphs referenced in the motion in reaching its decision.